266 P.2d 749

**PORTER v. PLOUGHE et al.**

**No. 5712.**

Supreme Court of Arizona.

Feb. 16, 1954.

David O. Brown, Mesa, for appellant.

Carl Tenney, Phoenix, for interpleader-defendant, appellee.

LA PRADE, Justice.

Appellant Porter (plaintiff below) is a licensed real estate broker who brought

suit to recover a realtor's commission claimed to have earned in selling defendants' property. He was denied judgment and brings this appeal.

Defendants listed their property with plaintiff on a so-called open listing for $13,500. On July 15, 1951, the ultimate purchasers, Mr. and Mrs. Fred Mitchell, arrived in Mesa, Arizona, from Iowa. On the morning of the 16th, in response to plaintiff's advertisement in a newspaper, they came to his office to inquire about properties for sale and after making known their wants, were shown several pieces of listed property by plaintiff's saleslady, Mrs. Kleinman. They were taken to the property of defendants, introduced to Mr. Ploughe, and inspected the property. Before going to the property the Mitchells had been informed as to the asking price. Later in the afternoon the Mitchells returned to the office of plaintiff and notified the saleslady they were prepared to make an offer for the property and desired to inspect it again. Their desires in this respect were met and the property was again inspected in the presence of Mr. Ploughe. On returning to the office the Mitchells authorized the saleslady to offer $11,500 and left a check for $1,000 as earnest money. The saleslady immediately called Mr. Ploughe on the telephone and informed him that she had an offer, with the request that he come to the office and discuss the matter, which he did. At this meeting he indicated that he would accept the offer if his wife

would. The saleslady then went to the place of business where Mrs. Ploughe was working and informed her that she had a buyer and would like to discuss the matter. This conversation led to a conference held at 6 P.M. at the home of the Ploughes, where the counteroffer was communicated to Mrs. Ploughe, who declined to accept the offer and *insisted* on the asking price of $13,500. The next morning the earnest money check was returned as a consequence of the positive position taken by Mrs. Ploughe. Mrs. Kleinman then spent a couple of hours with the Mitchells showing them other properties. Mr. Mitchell testified that when they parted Mrs. Mitchell said to Mrs. Kleinman, "See what can be done with those kids" (meaning the Ploughes).

Mr. Ploughe testified that on July 17th or 18th he listed the property with a Mr. Joe Jarvis, a realtor of Mesa, Arizona. Assuming that he did it made no impression on Mr. Jarvis, as will be seen. Jarvis met the Mitchells, and in connection with his business was showing them around Mesa with the idea of finding some property for them. While driving about they passed the Ploughe property, at which time Jarvis was informed by the Mitchells that they had seen the property through the services of Mrs. Kleinman and had attempted to buy it but with the statement that it was priced too high. Up to this time Jarvis had not informed the Mitchells that he had a listing on the property, nor had he suggested

showing it until he was aware of the Mitchells' interest in the property as a result of the services of Mrs. Kleinman. It was then that Mr. Jarvis suggested he might be able to get them together. On the evening of the 18th Mr. Jarvis took the Mitchells to the home of Mr. and Mrs. Ploughe, where the Mitchells again inspected the property. In relation to what happened at this meeting Mrs. Ploughe testified that she said to the Mitchells:

"There is no use fooling around about it—I want $13,500, and he (Mitchell) said, 'Well, we have to put in a new refrigerator in both apartments, and there is some repair work to be done,' and I said, *'All right, I will do this much, and that is all, I will come down $250.'*" (Emphasis supplied.)

With reference to this same conversation and circumstances Mr. Ploughe testified:

"A. Well, we was trying to get together on whether they wanted to pay the price we were asking or not.

"Q. And what happened, did you get together? A. We did on the price of—that *we cut the price $250.*" (Emphasis supplied.)

The Mitchells decided to think this over and returned to the office of Jarvis. After considerable conversation they finally concluded to buy at the new asking price of $13,250. The next morning Jarvis prepared a sales contract to that effect, which they and the Ploughes signed.

On the morning of the 20th the saleslady, Mrs. Kleinman, heard of the sale and went to the Ploughes and demanded the commission, which was refused. This suit was then instituted and the Ploughes interpleaded Jarvis. In their answer and complaint in interpleader they admitted they owed a commission fee but claimed they owed only one fee and were in doubt as to whom it was to be paid, and tendered the fee in court. The trial court at the close of the case was of the opinion that there existed a conflict in the evidence as to who was the procuring cause of the sale, and submitted the question to the jury on the following interrogatory:

"Was the plaintiff or his agent, Nina Kleinman, the procuring cause of the sale of the property described in the complaint?"

which was answered in the negative. The court on this special verdict entered judgment against the defendants in favor of Jarvis for $662.50 and costs, and directed this judgment be paid out of the funds in the hands of the clerk, theretofore deposited by defendants at the time they interpleaded Jarvis. The judgment further ordered that the defendants have judgment against the plaintiff on plaintiff's complaint and that they have their costs.

At the conclusion of the trial plaintiff made a motion for a directed verdict which was denied, and after the return of the

special verdict made a motion for judgment notwithstanding the verdict, which was denied. Likewise, a motion for a new trial was denied.

The following additional facts should be noted: On the evening of the 18th when the defendants, Mitchells, and Jarvis were all together, some conversation was had with reference to the defendants' possible obligation to plaintiff for a commission. Defendants voiced their concern over this possibility. Partly on the assurance of Jarvis that there was no liability to plaintiff, defendants signed the contract of sale wherein they promised to pay Jarvis a realtor's commission. We say "partly" because in this behalf Mr. Ploughe testified as follows:

"Q. Would you have signed that agreement other than upon the assumption that Mr. Jarvis was lawfully entitled to it? A. Yes."

To the same question Mrs. Ploughe said:

"I would have signed it, I think, because we wanted to sell the place."

Mr. Ploughe then testified that he thought that Mrs. Kleinman was out of the deal because she had not returned. This "thought" remained undisclosed and uncommunicated. The Ploughes did not notify plaintiff that they had reduced their asking price nor did they notify plaintiff that the negotiations for the sale of the property were "off".

The factual situation briefly summarized boils down to this: Defendants had offered their property to Mitchells for $13,500; the Mitchells countered by offering $11,500; this counteroffer was refused; the Mitchells then, for the third time, interviewed the sellers at their (Mitchells') suggestion to Jarvis of their interest in the property. At this meeting the sellers again insisted on their asking price of $13,500. Then upon the suggestion of the purchasers that they would have to make considerable costly improvements, the sellers reoffered their property for $13,250, which offer was accepted. The sellers voluntarily reduced their sale price, which information they did not convey to the plaintiff, and gave plaintiff no opportunity to attempt to effect a sale for this new asking price.

According to the general rule which we have adopted governing cases of this kind, if the plaintiff was the procuring cause of the sale he is entitled to the commission. That he was, does not seem to admit of a doubt. We say this regardless of the verdict which is contrary to the evidence as we shall point out. Such was the holding in the case of Williams v. Bishop, 11 Colo.App. 378, 53 P. 239, upon a set of facts strikingly similar to the facts in the case at bar, and Elmendorf v. Golden, 37 Wash. 664, 80 P. 264; Millage v. Irwin, 68 Colo. 188, 187 P. 525.

That Jarvis was not the procuring cause of the sale is demonstrated by the fact that he had not informed the Mitchells that he had a listing on the property, nor had he suggested or offered to show it to them

until informed by them of their interest in the property as a result of the services of Mrs. Kleinman. Jarvis, at the moment he became acquainted with the interest of the Mitchells, was the agent of the defendant sellers and his knowledge, so acquired, was their knowledge in law, and in fact when Jarvis brought the Mitchells again into the presence of the Ploughes.

It is just as if the defendants had consummated the sale themselves. Leadville Mining Co. v. Hemphill, 17 Ariz. 146, 153, 149 P. 384; Geiger v. Kiser, 47 Colo. 297, 107 P. 267; Combs v. Langston Inv. Co., 100 Okl. 21, 227 P. 94; Walker v. Bennett & Myers Inv. Co., 1926, 79 Colo. 170, 244 P. 465; Cunliff v. Hausman, 97 Mo. App. 467, 71 S.W. 368. These cases also recognize and state the general rule to be that where the owner, with or without the aid of a second broker, consummates a sale with a purchaser first produced by another broker, he is liable to the first broker on the theory that the first broker is the procuring cause.

In our Leadville Mining case, supra, this court quoted approvingly from the case of Jennings v. Trummer, 52 Or. 149, 96 P. 874, 23 L.R.A.,N.S., 164, as follows:

"* * * Whatever may be the rights of a real estate broker who takes a customer away from another and closes a sale between such customer and the owner, if done without the aid or connivance of the owner, yet if the owner, with knowledge of the facts, deals with the customer of the first broker, even through another agent, he will be liable to the first broker; * * *.'" [17 Ariz. 146, 149 P. 387.]

Then, on its own, the court recognized and stated the rule to be that sellers, after having been put in communication with a prospective purchaser by a realtor, may not carry on independent negotiations through another broker, and knowingly consummate a sale to the same prospect, and avoid paying a commission to the first broker.

At the Jarvis-Mitchell-Ploughe meeting, Mrs. Ploughe promptly and very unceremoniously announced: "There is no use fooling around about it—I want $13,500 * * *", clearly indicating a resumption of the negotiations had on the 16th with her flat refusal to take less than the asking price. Jarvis, with the knowledge that plaintiff had procured these prospective purchasers to whom he had endeavored to effect a sale at the price demanded by the sellers, found plaintiff's clients and took possession of them. The sellers, by reducing the price below that which they had authorized plaintiff to accept, rendered it impossible for plaintiff to make the sale, and ignoring plaintiff entirely effected it themselves. Actually Jarvis did not do one thing to induce the sellers to reduce the price. This reduction the sellers made voluntarily at the suggestion of the purchasers, not Jarvis. It is plain to see that Mrs. Kleinman, plaintiff's agent, had prepared the way for a sale. It is likewise

clear that when the Mitchells passed the house with Jarvis they were seriously interested in the premises and had only been deterred from making a purchase by the fact that they had considered the asking price too high. The speed with which the bargain was closed after they found out they could obtain the property for slightly less than the plaintiff's authorized price, is evidence of their desire to possess it, and is the reverse of any indication that they would not have come up to the new asking price had plaintiff been able to quote this price.

Under such circumstances defendants cannot defend themselves against plaintiff's claim by saying that they thought that Mrs. Kleinman was "out of the deal", or that they "thought" the negotiations were "off". Defendants had not dismissed plaintiff nor attempted to abandon the negotiations. That the negotiations were not "off" is indicated by the conduct and statements of defendants made to the Mitchells when presented by Jarvis.

The court was in error in failing to grant plaintiff's motion for judgment and in entering judgment for defendant Jarvis.

The judgment is reversed with directions to enter judgment for plaintiff against defendants for $662.50, being 5% of the sale price, and that there be applied toward the payment of the judgment any funds in the hands of the clerk by virtue of defendants' deposit with the clerk.

It is further ordered that plaintiff have judgment against interpleader, Jarvis, for his costs in the lower court and on appeal.

PHELPS, C. J., and STANFORD, J., concur.

WINDES, J., disqualified, having been the trial judge.

UDALL, Justice (dissenting).

First, I am of the opinion that the court should, on its own motion, have dismissed the appeal because of the insufficiency of appellant's assignments of error, which read:

"I. The Court erred in denying Appellant's motion for directed verdict.

"II. The Court erred in denying Appellant's motion for Judgment, notwithstanding the special verdict.

"III. The special verdict is contrary to law and *is contrary to the weight of evidence*. (Emphasis supplied.)

"IV. The judgment is contrary to law."

The inadequacy of these assignments to meet the requirements of our rules is so patent it requires no comment. See, Thornburg v. Frye, 44 Ariz. 282, 36 P.2d 548; Tidwell v. Riggs, 70 Ariz. 417, 222 P.2d 795; Meloy v. St. Paul Mercury Indemnity Co., 72 Ariz. 406, 236 P.2d 732; and the cases therein cited.

Secondly, if the appeal is to be considered on its merits, I dissent for the reason that I am unable to agree with the majority opinion which overrides both the unanimous verdict of the jury and the judgment of the trial court on a disputed issue of fact.

The issues are simple; broker Porter claimed that his efforts were the procuring cause of the sale, whereas the other broker, Jarvis, when required to interplead, claimed that he was the procuring cause. I maintain this presented a question of fact for the determination of the jury, assuming the evidence is in conflict thereon. Clark v. Ellsworth, 66 Ariz. 119, 184 P.2d 821. The jury was instructed that the issue of procuring cause hinged on whether or not the negotiations between Mrs. Kleinman, Mitchells and Ploughes had fallen through before Jarvis undertook to negotiate a deal. The correctness of this is not questioned, and it became the law of the case. The jury found Mrs. Kleinman, saleslady for Porter, was not the procuring cause, and therefore must have found her negotiations with Mitchells and Ploughes had fallen through. The majority decide as a matter of law that her negotiations had not fallen through.

It is my firm conviction that the majority have departed from our time-honored policy of stating the evidence in a light most favorable to sustaining the judgment of the trial court. Furthermore, I believe that in fact they are weighing the evidence as suggested in appellant's assignment number III. I believe that if we consider the record in the usual manner, with the inferences that can legitimately be drawn therefrom, the evidence amply supports the judgment that Jarvis was the procuring cause of the sale. I agree with the learned trial court that the request of each of the parties to take the case from the jury and decide the issues as a matter of law, should be denied.

Let us look at these additional facts: contrary to Mrs. Kleinman's testimony that negotiations were still active and pending between the owners and purchasers, we have the evidence of Mr. Ploughe that he saw the Mitchells only the one time, and Ploughe flatly denied that he had promised to protect Mrs. Kleinman in the matter of a commission, stating;

"I did not think it was necessary to have anything more to do with her because I felt that she couldn't bring the people up to her price so I just supposed it was over and I knew she just had an open listing."

Mrs. Ploughe gave her version of their rejection of the Mitchell offer of $11,500, and then testified:

"Q. Anything said by she (Mrs. Kleinman) or by you about any further activity on this offer, or was it just dropped there? A. It was dropped right there.

"Q. Anything further happen about it at all between you and Mrs. Kleinman? A. No, sir.

"Q. Did she contact you again at all? A. No, sir."

Later when asked

"Q. Would you have signed this defendant Jarvis' Exhibit 1 in evidence (the contract with the purchasers) except upon the belief that he (Jarvis) was entitled to the commission?"

she replied:

"A. I would have signed it, I think, because we wanted to sell the place. There was no doubt in my mind at that time except that she (Mrs. Kleinman) had given it up completely because she had offered the $11,500 and gone away, and that is the last I heard of it, and Mr. Jarvis then brought the people and I just thought it was all right."

In harmony with this is the testimony of the buyer, Mitchell, relative to their dealings with Mrs. Kleinman. He testified:

"She told us she could not get the folks (meaning the Ploughes) together. They would not face one another so we just dropped it then. As far as I was concerned that was out for me."

Later after their earnest money check was returned on the morning of July 17, Mitchell stated the Ploughe property was never mentioned or discussed between them; that they never saw Mrs. Kleinman though they were available had she tried to contact them. She herself testified that her understanding with the buyers was "If we cannot negotiate a transaction it (the check) would be returned". I believe that reasonable men, considering all of the evidence, could draw the logical conclusion that when Mrs. Kleinman returned the earnest money check on the morning of July 17th, her negotiations had fallen through. Certainly the record will *permit* the conclusion that Porter was procuring cause and that negotiations had not fallen through, but more certainly, the record does not *compel* such an inference.

The majority opinion states that Jarvis was neither the procuring cause of the sale nor in fact did he do anything to induce the sellers to reduce the price. In my opinion these are unjustifiable inferences not borne out by the record. It appears Jarvis had the confidence of the Mitchells, having known them for several years and at one time having represented them in a business deal. Where Mrs. Kleinman had, in their one joint conference, failed to sell the property in that she was unable to secure a meeting of the minds between the owner and purchaser, Jarvis succeeded by getting all of the parties together and after some concessions had been made on both sides signed them on the dotted line.

The majority assume as a fact that negotiations were still pending between Porter's saleslady and Ploughes and Mitchells—while actually this is the crucial issue of fact for the jury—and based upon this false premise they cite the cases of Millage

v. Irwin, Cunliff v. Hausman, and Walker v. Bennett & Myers Inv. Co. These announce the following proposition of law:

> " 'Where a prospective purchaser has been introduced to the owner by one broker and the negotiations are pending and have not fallen through, the owner cannot, with knowledge of the facts, complete the purchase with another agent, and avoid his liability for the commission due to the first broker. Thus the law will not permit one broker who has been intrusted with the sale of land, and is working with a customer whom he has found, to be deprived of his commission by another agent stepping in and selling to the customer for a price less than the first broker is empowered to receive.' " Millage v. Irwin, supra [68 Colo. 188, 187 P. 526].

I concede that this is a correct principle of law but deny its application to the conclusion which I contend the triers of fact were entitled to draw from the evidence adduced.

Some of the other cases cited and heavily relied upon are: Williams v. Bishop, Geiger v. Kiser, and Combs v. Langston Inv. Co., all of which stand for this principle, viz.:

> " 'If an owner of real estate lists his property with a real estate broker, and then sells directly, at a reduced price, to a purchaser the broker had found, and with whom he was negotiating a sale, * * * then the owner is liable to the broker for a commission on the price received.' " Combs v. Langston Inv. Co., supra [100 Okl. 21, 227 P. 95].

Obviously this can have no application to the facts found in the instant case except by assuming the false premise indulged in by the majority, i. e., that Ploughe sold the property direct to Mitchells and that Jarvis had nothing to do with procuring the sale. Incidentally none of these cases were interpleader actions.

In Leadville Mining Co. v. Hemphill, 17 Ariz. 146, 149 P. 384, 386, one Hemphill was employed by the mining company to put the mining company in contact with one who would finally purchase their property. Hemphill performed this service. Greenidge and Dugan were employed by the mining company to conclude the negotiations and get the purchaser on the dotted line, which they did. The mining company contended it was liable for but one commission and the case was brought upon that theory. Hemphill recovered and the mining company appealed. Greenidge and Dugan did not appeal. The lower court was affirmed because any error there may have been was not prejudicial to the mining company which was actually liable for two commissions. We said:

> " * * * The owner was at liberty to employ one person to find a customer and another to finally consummate a trade with that customer, and if the owner has done this it is just sim-

ply one of those cases where the own·er of property has by his acts made himself liable to pay double commissions on account of one transaction."

The majority state the Leadville Mining Company case stands for the proposition that a first broker recovers because he is the procuring cause of the sale. To the contrary in my opinion it stands for the proposition that where an owner offers to pay a broker for producing a customer to whom the property is later sold, the owner is·liable *even though* a second broker is the procuring cause of the sale.

Counsel for the defendant, Ploughe, in availing himself of the right to require the rival brokers to interplead, adroitly avoided a possibility of a double liability. Hence, when the realtor's commission of $662.50 was by order of court deposited with the clerk, the sole question for determination was who was entitled to the fee. The Ploughes have made no appearance in this court.

Had Porter seen fit to bottom his suit in tort rather than in contract and alleged that the owner Ploughe was guilty of bad faith in that he had not remained neutral between the rival brokers, and by reducing the asking price without giving Porter an opportunity to meet it, and had thereby given Jarvis an undue advantage, the result might have been different, but that is not this law suit.

For the reasons stated I would affirm the judgment.